Hughes & Hatcher, Inc., a Michigan Corporation v. Commissioner.
Hughes & Hatcher, Inc. v. Commissioner
Docket No. 2549.
United States Tax Court
1945 Tax Ct. Memo LEXIS 247; 4 T.C.M. (CCH) 369; T.C.M. (RIA) 45120; April 6, 1945
Lester S. Smith, Esq., and Jason L. Honigman, Esq., 2230 Buhl Bldg., Detroit, Mich., for the petitioner. Melvin S. Huffaker, Esq., for the respondent. DISNEY
Memorandum Findings of Fact and Opinion DISNEY, Judge: This proceeding involves deficiencies as follows for fiscal years ended January 31 in the years shown: 1941
1942
Income tax
$4,691.24
$ 8,738.32
Declared value excess
profits tax
714.19
1,344.70
Excess profits tax
3,617.72
11,058.58 Several issues were settled by stipulation and the necessary adjustments therefor will be reflected in the computation under Rule 50. The remaining issue is whether petitioner is entitled to an additional allowance each year for rentals paid. Petitioner filed its returns *248 for the taxable years with the collector for the district of Michigan. Findings of Fact In 1931 or 1932 Jacob M. Pincus purchased the assets of Hughes & Hatcher, Inc., a bankrupt corporation, in order to protect the stock he held in Pincus Bros., Inc., a clothing manufacturer to whom the bankrupt was indebted in the amount of about $73,000 for purchases. The buyer did not own any stock of the bankrupt corporation. Thereafter, in 1932, Jacob M. Pincus organized the petitioner under the laws of Michigan and transferred to it in exchange for all of its stock the assets which he had acquired from the bankrupt corporation. Since then, the petitioner has been engaged in the business of selling, at retail, men's clothing and furnishings at 2301 Woodward Avenue, Detroit, Michigan. Prior to 1937, the petitioner rented the premises it occupied for its business from an estate which did not own any of its stock. In 1937, Jacob Pincus purchased the premises at a cost of $120,000. On December 14, 1937, he leased the property to petitioner for a term expiring December 31, 1942, at an annual rental of $17,500, and 4 1/2 per centum of $250,000 of the lessee's annual gross sales in excess of *249 $500,000 and 5 1/2 per centum of annual gross sales in excess of $750,000. It was agreed in the lease that in the event the lessor made additions to the building on the premises at his own expense, upon completion thereof the minimum rental would be $33,750 a year, plus 5 1/2 per centum of annual gross sales in excess of $750,000. Before he executed the lease, the lessor requested his attorney to ascertain what would be a fair rental for the property, and, if possible, to obtain advice from real estate brokers in Detroit. The attorney consulted a firm of real estate brokers in Philadelphia, which represented and transacted considerable business with chain stores in Philadelphia and other cities, and had some knowledge of the property to be leased, about the matter and was advised that a fair rental for the premises would be about $20,000 a year or from 5 to 7 per cent of sales. The attorney imparted such advice to the lessor. In May 1939, the term of the lease was extended to December 31, 1947. The additions and improvements contemplated by the lessor were commenced in June 1939 and completed in November 1939 at a cost to him of about $194,000, of which about $61,000 represented *250 the cost of fixtures and equipment installed in the store room. The additions made increased the selling space from 5,500 square feet to 12,000 square feet, and the improvements made converted the appearance of the building into one of the finest retail clothing stores in Detroit. The property was located on the extreme end of the downtown business section of Detroit. The cost of about $314,000 to the lessor for the premises and improvements made on it was a speculative investment, due, in part, to the fact that the building, as improved, was for a special purpose. There was parking space for automobiles on adjoining property in the rear of the premises. On January 2, 1940, petitioner and the owner canceled the lease executed on December 14, 1937, and entered into a new one for the premises for a term of seven years ending December 31, 1947, at an annual rental of $33,750, plus 4 1/2 per centum of gross sales of the lessee in excess of $750,000 a year. The lessor agreed to pay one-half of the cost of free parking furnished by the lessee to its customers. On October 28, 1940, Jacob M. Pincus and his brothers, Nathan Pincus and Henry Pincus, entered into an agreement, in which, after *251 reciting, among other things, that the parties thereto desired to record their respective rights and interests in petitioner and the real estate it was occupying as lessee, and that petitioner was indebted to Jacob Pincus in the amount of $63,000, agreed, among other things, that the capital of petitioner should be changed so as to consist of 100 shares of common stock, par value $10 a share, and 3,400 shares of preferred stock, each class to participate in dividends on an equal basis; that petitioner's stock should be issued as follows: Common
Preferred
Jacob Pincus
51 shares
1250 shares
Nathan Pincus
30 shares
1250 shares
Henry Pincus
19 shares
900 shares and that in payment for the stock Jacob Pincus should cancel $62,500 of the indebtedness of petitioner to him; and that Nathan Pincus and Henry Pincus should pay $62,500 and $45,000, respectively, in cash to petitioner. The agreement also provided for the execution of a new lease between Jacob M. Pincus and petitioner, in which the lessee would agree to pay any increase in taxes on the premises in excess of taxes payable for the current period and that the term of the lease should be for a period of *252 17 years, commencing January 1, 1941. The parties also agreed that the by-laws of petitioner should be amended to provide for nonpayment of dividends out of earnings or otherwise during the term of the new lease, unless the distribution would leave the value of the stock of petitioner not less than $300,000 and petitioner's indebtedness was not in excess of $100,000, except by consent of the holders of at least 85 per centum of the common stock of petitioner; also that the terms of the new lease should not be modified without the approval of the holders of at least 62 1/2 per centum of the outstanding voting stock. The amounts were paid by Nathan and Henry Pincus and the stock of petitioner was issued, all in accordance with the agreement. The stockholders held about the same percentages of stock of Pincus Bros., Inc. The parties were represented by separate counsel during negotiations resulting in the execution of the agreement. Pursuant to provisions of the contract of October 28, 1940, on November 1, 1940, but effective January 1, 1941, a new lease was executed for the premises, extending the rental term to December 31, 1957, at an annual rental of $33,750, plus 4 1/2 per centum *253 of gross sales of the lessee in excess of $750,000 a year. The lessee agreed to pay, as additional rent, any city, state and county taxes on the leased premises in excess of the taxes levied for 1940 and premiums on not less than $135,000 of fire insurance on the building and fixtures, and the lessor agreed to pay one-half of the cost of free parking then being furnished by petitioner to its customers. Since about 1930 it has been a common practice to lease commercial property in Detroit, Michigan, at a rental based upon a percentage of the lessee's sales, with a minimum rental. The range in Detroit during 1940 for retail clothing stores was from 6 per centum to 8 per centum. Under such leases it is unusual for the lessor to furnish store fixtures at his own expense. There has been a great increase in rentals under percentage leases since about 1941. In 1941 the premises involved herein were appraised at a fair market value of about $250,000. The gross sales of petitioner and rentals paid for the fiscal years ended July 31, in 1937 and 1938 and the period of 18 months ended January 31, 1940, were as follows: Aug. 1, 1938
to Jan.
1937
1938
31, 1940
Gross sales
$684,925.09
$637,239.87
$1,219,291.30
Rentals
6,978.25
15,745.00
50,267.57
*254 During the taxable years the gross sales of petitioner for the purpose of computing rental payments, the rental paid and parking expense borne by the lessor, were as follows: 1941
1942
Gross sales
$1,191,055.40
$1,637,680.54
Rental paid
53,597.50
73,696.35
Parking expense
2,426.20
2,722.82 The real estate taxes on the premises were about $6,000 a year. In addition to the above rentals, the petitioner paid $768.50 and $820.04 in the respective taxable years for rental of warehouse space. The store hours of petitioner were from 9 A.M. to 9 P.M. About one-third of its business was done after 6 P.M. The war increased the sales of petitioner. The surplus of petitioner on January 31, 1940, and January 31, 1942, was $4,874.72 and $148,222.40, respectively. In its returns for the taxable years the petitioner claimed deductions of $54,366 and $74,516.39, respectively, for rentals. The respondent allowed $33,750 each year and disallowed the remainder as excessive rental. The rentals paid by the petitioner during the taxable years for the premises in question were fair and reasonable. Opinion The respondent disallowed so much of the amounts claimed by *255 petitioner as deductions for rent paid, as was in excess of the minimum rental of $33,750 payable annually for the premises at 2301 Woodward Avenue under the leases executed on January 2, 1940, and November 1, 1940. The amounts so disallowed included the rents paid for warehouse space, but the deductibility thereof is not being contested by the respondent upon brief. The amounts in controversy were disallowed in the deficiency notice upon the ground that they were excessive. Upon hearing, for the first time, and upon brief respondent contends that only the amount of $33,750 allowed each year constitutes a reasonable allowance under the provisions of section 23(a)(1) of the Internal Revenue Code; that amounts in excess thereof were not ordinary, necessary and reasonable under that section and represent, in effect, distribution of profits by petitioner to its majority stockholder, the lessor. Although, quoting only a portion of section 23(a)(1) of the Internal Revenue Code, [1] the respondent contends that thereunder rental payments must be ordinary, necessary and reasonable in amount, we find it unnecessary under the facts presented to *256 us in the case, to decide that question and definitely do not here decide it; for upon all of the evidence adduced we consider and find it clear that even though we assume the soundness of respondent's argument, the total amounts paid by the petitioner as rent meets such test of reasonableness. There is indisputable proof in the record that it is not unusual for a lessee of business property to agree to pay rental based upon a percentage of sales, with a specified minimum amount. Qualified witnesses for petitioner testified to numerous leases for business property in Detroit in which the agreed rental ranged from 5 to 8 per centum of the lessee's sales, without any assumption by the lessor of any part of the cost of free parking for automobiles of customers of the lessee and, in the majority of the cases, without an agreement of the lessor to furnish fixtures for the store room. These witnesses testified that the rentals paid by petitioner during the taxable years were reasonable and fair and their opinions are in line with advice given the lessor prior to the execution of the first lease in 1937. The increases in rental during the taxable years over prior taxable years were due, in *257 part, to an increase in sales created by war conditions. From the uncontradicted testimony of these witnesses, and other evidence, we have found that the rentals paid by petitioner were fair and reasonable. The contention of respondent that the rentals paid each year in excess of $33,750 were, in effect, a distribution of profits to petitioner's majority stockholder was raised for the first time at the *258 hearing and the point is hardly more than mentioned in his argument upon brief. Our conclusion that the rentals paid were fair and reasonable for the premises, disposes of the point for the finding that the amounts paid represented a fair rental, is contrary to any idea that there was concealed distribution of profits. Although at the time the first lease was entered into, the lessor owned all of the petitioner's stock and was, therefore, in a position to fix the terms of the lease, he sought, and obtained, authoritative advice on the rentals to be charged. The amount fixed was less than the amount he was advised would be a reasonable charge. The amount based upon sales in excess of $750,000 was reduced in the lease executed on January 2, 1940, from 5 1/2 per centum to 4 1/2 per centum. That lease was in effect during the first ten months of the first taxable year involved herein. The lease in effect during the remainder of the taxable years involved no substantial changes and was entered into with the approval of all of the stockholders of petitioner after negotiations in which they were represented by counsel. We are unable to find that any part of the rentals paid represents a distribution *259 of profits of petitioner. Decision will be entered under Rule 50. Footnotes
1. SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: (a) Expenses. - (1) Trade or Business Expenses. - (A) In General. - All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a reasonable allowance for salaries or other compensation for personal services actually rendered; traveling expenses (including the entire amount expended for meals and lodging) while away from home in the pursuit of a trade or business; and rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity.↩